J-A34034-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| F.B. | | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | Appellee | |
| | v. | |
| M.M.R. | | |
| | Appellant | No. 1846 MDA 2013 |

Appeal from the Order Entered September 24, 2013
In the Court of Common Pleas of Dauphin County
Domestic Relations at No: 00441-DR-12

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED MARCH 24, 2015**

Appellant, M.M.R., appeals *pro se* from the September 24, 2013 civil contempt order entered in the Court of Common Pleas of Dauphin County.[1] Appellant contends the trial court erred by issuing a civil contempt order against him without making a finding that he willfully disobeyed a court order.  We disagree and, therefore, affirm.

---

[1] Appellant also appealed from an order entered on October 8, 2013 in the Court of Common Pleas of Dauphin County, awarding child and spousal support to his two children and his wife, F.B.  **See** 2006 MDA 2013.  The full procedural and factual history of the case appears on pages 1 through 8 of the trial court opinion accompanying the October 8 order and is a supplement to the trial court's Rule 1925(a) opinion issued on February 4, 2014 in the instant appeal.  We likewise incorporate the procedural background and factual background on pages 1 through 8 of the October 8, 2013 trial court opinion in this memorandum as if fully set forth herein.

The trial court filed its opinion pursuant to Pa.R.A.P. 1925(a) on February 4, 2014 and filed an amended opinion later that same day. In its amended opinion, the trial court offered a condensed version of the lengthy procedural history of the case as follows:

Contemnor [Appellant, M.M.R.] is the father of two minor children (dates of birth 1/06 and 12/09) with his wife, support obligee [Appellee, F.B.]. An initial order of child support was entered on July 11, 2012, effective March 14, 2012, per agreement of the parties. Under that order, contemnor agreed to pay $1,200 per month in child support plus $10 on arrears and obligee agreed to drop her claim for spousal support. Two months later, contemnor filed a petition seeking to decrease his child support obligation under the agreed order. I denied his request and contemnor sought de novo review. Following the de novo hearing, I issued an order December 11, 2012 raising contemnor's child support obligation to $1,900 per month plus $380 per month on arrears, effective September 7, 2012.

Both parties filed petitions for reconsideration of the December 11, 2012 order, which I granted January 11, 2013. On April 11, 2013, I formally vacated my December 11, 2012 order and scheduled a hearing to address the many issues raised in the reconsideration petitions including the parties' earning capacities, the validity of an Egyptian divorce decree and the legal effect of any immigration[] documents on contemnor's duty of support. I also granted obligee's request to reinstate her spousal support/alimony pendente lite claim as of the date of her request, January 11, 2013.[2] The effect of my April 2013 order (vacating the December 11, 2012 order) was to reinstate the original child support order which required that contemnor pay $1,200 per month plus $10 on arrears.

[2] That hearing was held May 17, 2013, following which I issued my October 8, 2013 opinion which addressed all issues raised and under which I modified contemnor's support obligation as follows: (1) effective September 7, 2012 through January 10, 2013, contemnor owed $909 per month child support; (2) effective January 11, 2013

- 2 -

through August 31, 2013, contemnor owed $909 per month child support and $386 spousal support; and (3) effective September 1, 2013 to date, contemnor owes $856 per month child support and $89 spousal support, plus $190 per month arrears. Contemnor has filed an appeal to the Superior Court from my decision, currently pending. *F.B. v.* [*M.M.R*]*.*, No. 2006 MDA 2013 (Pa. Super.).

On January 8, 2013, the Dauphin County Domestic Relations Section filed a petition for contempt against contemnor asserting his failure to make regular child support payments (then charging at $1,900 per month plus $380 on arrears) and scheduling a contempt hearing for March 5, 2013. Contemnor was notified he could purge his contempt by paying $9,000 before the hearing. Around February 12, 2013, contemnor made a $2,238 payment to the Domestic Relations Section which brought him current through February 2013 and as a result, he was notified by the Domestic Relations Section that his contempt hearing was continued but would be rescheduled if he failed to make future payments. He was also informed, in a "Case Status" notice sent to him by the Domestic Relations Section, that he still owed child support under the then-applicable order of $1,900 per month plus $380 on arrears.

Contemnor failed to make any payments toward his child support obligation and arrears for the next five months (March through July 2013). Thus, on August 20, 2013, the Domestic Relations Section filed another contempt petition. Notices were sent to contemnor on August 21, 2013 including that he could purge himself of the contempt charge by paying $6,050 prior to the hearing. The new purge figure was based upon contemnor's failure to pay support in the reinstated amount, of $1,200 per month plus $10 on arrears, from March through July 31, 2013. Contemnor failed to meet the purge amount and later filed an answer to the contempt petition, dated September 20, 2013, asserting an inability to pay.

During the course of the [September 24, 2013] contempt hearing, contemnor testified that he was "really struggling financially" and had filed a bankruptcy petition. He nevertheless discussed his ownership of two properties which he represented were under pending contracts for sale. He indicated as well that he had made a deal to do consulting work for an unnamed employer and that in concert with the property sales he would be placed in a better financial position. Later, after discussing the

amount of the purge in this case, I held the following discussion with contemnor:

> The Court:  Okay.  Now you believe you can purge yourself of your contempt because you are going to be getting some cash from the sale of real estate.
>
> M.R.:  But I am just being honest, Your Honor, I am not getting the amount.  I will be given some amount and can make some payments but I am not going to be able to make the entire $6,000.
>
> The COURT:  Well, when is the property closing?
>
> M.R.:  We have 30 days but they are going through due diligence right now so it may be a little bit of play.  If I get that, I have no problem.  **Absolutely will be able to pay the amount in full so $6,000 is not going to be a big deal at all.**  So I have two offers.  I accepted one, the higher one of course and they are going through due diligence right now because it is a chain.  So they want to modify the building a little bit so they are going through due diligence about the environmentals.  There is some poles in the back.  They want to move them to the back.  They are almost done so we should be probably closing within 30 to 45 days.
>
> THE COURT:  Okay.  We will hold him in contempt.  The purge of $6,050 shall be paid within 60 days.
>
> M.R.:  If I get 90 days that would be fantastic.

(NT. 18-19 (emphasis added))

At the conclusion of the hearing, I issued an order finding M.R. in contempt on the basis that he had willfully failed to pay child support while having the financial ability to pay.  I sentenced him to six months intermediate punishment with eligibility for work release.  I directed that if he failed to pay his $6,050 purge by December 26, 2013 - within the 90 days requested by contemnor - he report to the Dauphin County Prison.  Contemnor filed an appeal on October 18, 2013.  *F.B. v. M.R.R.*, 1846 MDA 2013 (Pa. Super.))  Notably, on December 26, 2013, contemnor paid $6,050 directly to the Domestic

Relations Section thus purging himself of any contempt. Despite this fact, contemnor is still pursuing his appeal.

Amended Trial Court Opinion (T.C.O.), 2/4/14, 1-3 (references to notes of testimony omitted).

Appellant presents one issue for this Court's consideration:

1. Did the trial court err by issuing a civil contempt order without making any finding that Appellant has willfully disobeyed a court order?

Appellant's Brief at 8.

As noted by the trial court, Appellant purged himself of contempt when he paid the full purge amount of $6,050 on the date set by the trial court as the deadline for doing so. T.C.O., 2/4/14, at 3. Therefore, we must first address whether the matter before this Court is moot. In **Orfield v. Weindel**, 52 A.3d 275 (Pa. Super. 2012), this Court considered whether an appeal from a contempt order was moot in light of the fact appellant had been released from prison after serving his six-month contempt sentence. Quoting **Warmkessel v. Heffner**, 17 A.3d 408 (Pa. Super. 2011), this Court explained:

> This Court will decide questions that otherwise have been rendered moot when one or more of the following exceptions to the mootness doctrine apply: 1) the case involves a question of great public importance, 2) the question presented is capable of repetition and apt to allude appellate review, or 3) a party to the controversy will suffer some detriment due to the decision of the trial court.

**Orfield**, 52 A.2d at 278 (quoting **Warmkessel**, 17 A.3d at 413) (additional citations omitted). This Court determined that Orfield met a mootness

exception because he had not paid off his arrears and was still subject to an order requiring monthly payments.  His noncompliance would again subject him to civil contempt proceedings.  *Id.* (citing, *inter alia*, **Warmkessel**, where the challenge was found not to be moot because Warmkessel was subject to a continuing support order and could again face civil contempt proceedings in the event of a failure to comply with that order).  As in **Orfield** and **Warmkessel**, we find that Appellant's issue meets the mootness exception because he continues to be subject to support orders and could again face contempt proceedings if he fails to comply with those orders.  Therefore, we shall consider the merits of his claim.

In **Orfield**, we explained that "[o]ur scope of review when considering an appeal from an order holding a party in contempt of court is narrow: We will reverse only upon a showing of an abuse of discretion.  The court abuses its discretion if it misapplies the law or exercises its discretion in a manner lacking reason."  **Id.** at 278 (quoting **Hyle v. Hyle**, 868 A.2d 601, 604 (Pa. Super. 2005) (internal citations omitted)).  "Furthermore [e]ach court is the exclusive judge of contempt against its process, and on appeal its actions will be reversed only when a plain abuse of discretion occurs." **Warmkessel**, 17 A.3d at 413 (citation omitted).

> The purpose of a civil contempt order is to coerce the contemnor to comply with a court order.  Punishment for contempt in support actions is governed by 23 Pa.C.S. § 4345.  Section 4345 provides that

**(a) General rule.**—A person who willfully fails to comply with any order under this chapter, except an order subject to section 4344 (relating to contempt for failure of obligor to appear), may, as prescribed by general rule, be adjudged in contempt. Contempt shall be punishable by any one or more of the following:

    (1) Imprisonment for a period not to exceed six months.

    (2) A fine not to exceed $1,000.

    (3) Probation for a period not to exceed one year.

**(b) Condition for release.**—An order committing a defendant to jail under this section shall specify the condition the fulfillment of which will result in the release of the obligor.

23 Pa.C.S. § 4345.

To be found in civil contempt, a party must have violated a court order. Accordingly, the complaining party must show, by a preponderance of the evidence, that a party violated a court order. The alleged contemnor may then present evidence that he has the present inability to comply and make up the arrears. When the alleged contemnor presents evidence that he is presently unable to comply[,] the court, in imposing coercive imprisonment for civil contempt, should set conditions for purging the contempt and effecting release from imprisonment with which it is convinced beyond a reasonable doubt, from the totality of the evidence before it, the contemnor has the present ability to comply.

*Orfield*, 52 A.2d at 278-79 (internal citations omitted).

At the September 24, 2013 contempt hearing, the trial court explained to Appellant that the "the standard is what has not been paid in the last six months, not what your total arrears are. . . . [W]hen we have contempt court it is what has not been paid in the last six months." N.T. Contempt

- 7 -

Hearing, 9/24/13, at 8. Because Appellant made a payment in February 2013, the requested purge amount was $6,050, based on five months of support payments at $1,200 per month plus $10 per month on arrears in accordance with the terms of the July 11, 2012 support order, which was entered into by agreement of the parties. *Id.* at 3, 17-18.[3] Appellant offered various reasons for not paying support, including his contention that Appellee presented false documents at the July 11, 2012 hearing, *id.* at 4, and the fact that a December 11, 2012 order requiring monthly support payments of $1,900 was "modified and then vacated later on." *Id.* at 6-7. He contended he was under the impression that a new order would be issued, not realizing that by vacating the order, the earlier child support order would remain in effect. *Id.* at 20-21.[4] He also claimed he was facing

---

[3] The July 11, 2012 order was a final order based on agreement of the parties that Appellant would pay $1,200 in monthly child support and Appellee would withdraw her request for alimony pendente lite and spousal support. N.T., 7/11/12, at 26-28. Both parties were represented by counsel at that proceeding.

[4] Pa.R.C.P. No. 1910.1(c) provides that, "[a]s used in this chapter . . . the following terms shall have the following meanings: . . . 'Vacate,' declare a particular support order null and void, as if it were never entered." Once the December 11, 2012 was deemed "null and void, as it were never entered[,]" the July 11, 2012 was once again in full force and effect.

We recognize Appellant is before this Court *pro se*. However, "any layperson choosing to represent himself in a legal proceeding must, to some reasonable extent, assume the risk that his lack of expertise and legal training will prove his undoing." *Rich v. Acrivos*, 815 A.2d 1106, 1108 (Pa. Super. 2003) (internal citations and quotations omitted).

obstacles to pursuing international business because his Egyptian and American passports expired after being seized as a result of a protection from abuse order entered against him in a proceeding initiated by Appellee. *Id.* at 10.

The trial court explained that due process required a hearing to determine whether there was a basis for finding Appellant in contempt. N.T., 9/23/14, at 20. After conducting that hearing, the court announced its finding that Appellant was in contempt and provided 90 days to pay the purge. *Id.*

In its Rule 1925(a) opinion, the trial court explained that Appellant's violation of the support orders was "clear." T.C.O., 2/4/14 at 5.

> [Appellant] admittedly failed to make monthly child support payments between March and July, 2013. [Appellant] suggested at the hearing and in his statement of errors that he was confused by the support orders whereby after [the trial court] vacated the December 11, 2012 child support order of $1,900 plus $380 on arrears (on April 11, 2014), he was not aware that the result was the reinstatement of his original child support obligation of $1,200 per month plus $10 on arrears. He implies that he assumed he owed *no* child support after the December order was vacated. This is not a credible claim and does not explain why [Appellant] failed to make his March and April payments. [Appellant] further admitted that he was informed at some point by Domestic Relations Section that he did in fact owe $1,200 per month yet failed to make those payments. Accordingly, the record supported the finding, by a preponderance of the evidence, that [Appellant] violated applicable court orders.

*Id.* at 5-6.

Our review of the record leads to the conclusion that the trial court did not abuse its discretion in finding that Appellant willfully failed to comply with the trial court's July 11, 2012 support order. Therefore, there is no basis for disturbing the trial court's ruling. Because we have adopted the Procedural Background and Factual Background for the trial court's October 8, 2013 opinion in the related case filed at 2006 MDA 2013, we direct that a copy of that October 8, 2013 opinion be attached to any future filings in this case.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/24/2015

Copies Mailed _10-9-13_ _M E R_ ORIGINAL

F.B.,

    Plaintiff / Obligee

        v.

M.R.,

    Defendant / Obligor

: IN THE COURT OF COMMON PLEAS
: DAUPHIN COUNTY PENNSYLVANIA
:
: No. 441 DR 2012, PACSES
:
:
: SUPPORT

## OPINION

Before the court are the cross motions for reconsideration filed by the parties in this child and spousal support action. The primary issues concern the parties' incomes and earning capacities, whether this court must recognize an Egyptian divorce decree and whether the defendant is obligated to support plaintiff under an affidavit of financial support he allegedly executed pursuant to immigration law.

## Procedural Background

Father M.R. and Mother F.B. were married in Cairo, Egypt on March 1, 2005. The marriage was Father's third and Mother's first. Father, the obligor in this support action, is a dual citizen of Egypt and the United States and Mother, the obligee, is a citizen of Egypt. Mother arrived in the United States in September 2005. Father claims they divorced under an Egyptian divorce decree issued January 19, 2006. Mother denied they were divorced asserting the decree a fraud. In any event, the parties lived together until they separated February 5, 2012. They are the parents of two children (dates of birth 1/23/06 and 12/29/09).

Mother filed a complaint seeking child and spousal support March 14, 2012. On May 7, 2012, following a conference in the Dauphin County Domestic Relations Section, I issued an order as recommended by the conference officer, directing that Father pay $425.50 per month child support and $43 per month on arrears (effective March 14, 2012). In recommending the order, the conference officer calculated support under the Support Guidelines assigning monthly net incomes of $1,594 to Father and $0 to Mother.[1] In calculating support, the hearing officer

---

[1] Using those incomes, obligor's child support obligation under the Guidelines was $565 per month.

based Father's monthly net income upon his actual 2011 earnings as reflected on his tax return. Mother was assigned no earning capacity because she lacked identification, spoke little English, had only a brief and limited work history and was caring for the parties' two young children, thus not necessitating a child care expense. (See N.T. 7/11/12 at 2-3)

A hearing on spousal entitlement as well as on Father's request for de novo review of the child support amount was held on July 11, 2012. Father argued the support amount should be decreased because it failed to consider Mother's income or the money he spent on his other two children. Mother sought an increase in child support arguing that Father had a significantly higher earning capacity. She also argued that she was entitled to spousal support. At the conclusion of the hearing, the parties reached a settlement whereby Father agreed to pay Mother $1,200 per month in child support and Mother agreed to drop her claim for spousal support. The parties' agreement was set forth in an Order dated July 11, 2012, effective March 14, 2012.

On September 7, 2012, Father filed a petition with the Domestic Relations Section, seeking to decrease his obligation under the agreed order, claiming his gross annual income had dropped to $19,000. On October 2, 2012, I signed the hearing officer's recommended order denying the petition on the basis of no significant change in circumstances since the parties' had reached their agreement. Father sought de novo review and I held a hearing December 11, 2012. The parties agreed at that hearing to incorporate into the record the testimony from the July 11, 2012 hearing. (N.T. 12/11/12 at 6-7)

At the conclusion of the December hearing, I issued an order raising Father's child support obligation to $1,900 per month plus $380 per month on arrears, effective September 7, 2012. This order was based upon consideration of an Affidavit of Support (I-864) Father had purportedly executed as part of his sponsorship of Mother under immigration law (discussed in more detail below). I also indicated to Father that I would provide him with a credit against his support obligation to the extent he could provide proof of any mortgage payments or expenses he paid on the marital home he owned in which Mother was living with the children. Both parties filed timely petitions for reconsideration which I granted January 11, 2013. On April 11, 2013, following a

---

Pa.R.C.P. 1910.16-3. That number was reduced to $425.50 for a multiple family deviation whereby Father was providing direct support for two children from his second marriage. Pa.R.C.P. 1910.16-7.

2

thorough review of the record, including of transcripts from the prior two hearings, I vacated my December 2012 order and scheduled another hearing on all issues raised in the reconsideration petitions, including the parties' earning capacities. I also granted Mother's request that her claim for spousal support/alimony pendente lite be reinstated as of the date she filed her request, January 11, 2013. The final hearing on this matter was held May 17, 2013, at which both parties testified, chiefly as to their incomes and earning capacities, as well as to the parties' marital status and potential financial obligations Father owed Mother under immigration law and whether it was proper to base Father's child and spousal support obligation on the Affidavit of Support.

## Factual Background

### Immigration Issues and Marital Status

Father arrived in the United States in 1987 and became a naturalized U.S. citizen in 1991. He and Mother engaged in early 2005 and were married in Egypt on March 1, 2005. At the time, Mother was living in Egypt and had never been to the United States. She did not speak, read or write English. In order for Mother to enter the United States, Father submitted a Visa petition on February 12, 2005 through the U.S. Citizenship and Immigration Services (USCIS) on Mother's behalf, indicating that Mother was applying for entry as an alien (K1) fiancée. (Court Exbt. 7 (I-129F Petition); Father's Answer to Mother's Reconsideration Petition, ¶2) [2] As required by USCIS, Father also submitted an Affidavit of Support (I-134) guaranteeing that he would sponsor Mother financially for up to three years and not allow her to become a public charge. (Court Exbt. 7 (I-134); N.T. 12/11/12 at 15-16) Mother's K1 Visa was issued September 5, 2005, with an expiration date of March 4, 2006. (Exbt. P-1) On September 22, 2005, Mother arrived in the U.S. under her K1 Visa.

Under the terms of the K1 Visa, Mother was to marry Father within ninety days of her arrival (by December 21, 2005) following which the parties could begin the process of submitting her application for a Green Card in order for her to obtain permanent residency status and remain in the U.S. indefinitely, otherwise, she would only be permitted to remain here legally until the expiration of her K1 Visa. It is not entirely clear why the parties sought to obtain a fiancée Visa for Mother when they had already been married in Egypt. Mother explained that

---

[2] All citations to exhibits are for those submitted at the final May 17, 2013 hearing, unless otherwise noted. (See N.T. 5/17/13 at 18-20)

she had been told by Father, prior to her arrival, that the Egyptian marriage would not be recognized in the U.S. (N.T. 5/17/13 at 46-47) This court finds this explanation credible particularly where documentary evidence reflects that, they both indicated an initial intention to marry in the U.S. within the ninety-day period but that Father later refused.

Following the parties' marriage in Egypt, both remained there until Father returned to the U.S. on May 15, 2005. (N.T. 5/17/13 at 30) Sometime after the marriage but before his return to the U.S., Father claimed he allegedly discovered that Mother had been engaged to another man and was just using him to obtain a residence in the U.S. (Father's Answer to Mother's Reconsideration Petition, ¶ 4) He claims to have immediately initiated divorce proceedings in Egypt at that time. (Id.) He asserted he also attempted to alert the U.S. Embassy in Egypt to this alleged fraud and to withdraw the K-1 Visa petition, which actions were to no avail. (Id. at ¶ 6) In any event, Father claimed that the Egyptian government eventually issued a divorce decree dated January 19, 2006. (Court Exbt. 5)

Mother denied Father's allegations of a prior engagement as well as that she and Father ever divorced, claiming she was never notified of the divorce proceedings and never given a copy of the decree. (N.T. 5/17/13 at 16, 21) Mother believes that the Egyptian divorce decree submitted by Father to the court is in fact a fake. (N.T. 5/17/13 at 22-23) She elaborated that neither she nor Father were in Egypt on the date the decree indicates they attended the divorce proceeding in person (January 19, 2006) - noting she gave birth to the parties first child in the U.S. just four days later – and that her brother, who is indicated in the decree as having witnessed the divorce, never attended as a witness. (N.T. 7/11/12 at 12-15; N.T. 5/17/13 at 21-22, 30) At the third hearing, Father explained that this divorce was entered in *absentia* which he claimed was a permissible method for obtaining divorce in Egypt. (N.T. 5/17/13 at 52)

Following Mother's arrival in the U.S. on September 22, 2005, Father refused to (re)marry her within ninety days or help her obtain her Green Card. (Father's Answer to Mother's Reconsideration Petition ¶ 8; N.T. 5/17/13 at 15-16) Nevertheless, following her arrival, Father and Mother lived together as a couple for more than six years, including after their alleged divorce, during which time the parties had a second child.

4

Because the parties never married in the U.S., they never formally submitted an application to the USCIS for Mother to obtain her Green Card. (N.T. 12/11/12 at 15) Nevertheless, at the first hearing in July 2012, Mother submitted a series of documents related to the Green Card application process, which this court initially assumed had been submitted to the USCIS.[3] It appears from the testimony and a review of these documents that they were all filled out in Father's handwriting in contemplation of submitting them to the USCIS in order for Mother to become a permanent resident, including those where the applicant is identified as Mother. However, because Father refused to (re)marry Mother within the ninety-day window, none of the documents were ever apparently submitted to the USCIS, including most notably the I-864 Affidavit of Support. (Court Exbt. 6) Father signed that document December 21, 2005, before a notary, agreeing to sponsor Mother and provide her with the necessary support to maintain her at an income at least 125 percent of the Federal poverty guidelines. It was based upon this Affidavit of Support that I issued my December 11, 2012 child and spousal support order, later vacated.

### Income and Earning Capacities

Father is currently 51 years old. His educational background is somewhat unclear given the evidence offered. At the final hearing, Father denied having attended college though he claimed to have obtained online Bachelor's degrees in international business/finance and corporate psychology. (N.T. 5/17/13 at 68-69) Nevertheless, he admitted that as part of a psychological risk evaluation performed of him in November 2012, in connection with custody litigation, he informed the evaluator that he had attended and graduated from George Washington University with degrees in international business and psychology. (Exbt. P-2) Father also told the evaluator that he earned additional degrees including a Masters in finance from Columbia University in 1992 and a Ph.D. in international law from Harvard in 1996. Id. He denied at the final hearing obtaining either of the post-graduate degrees but stated they were just "online certificates." (N.T. 5/17/13 at 82)

---

[3] These documents, which I re-admitted as Court exhibits at the third hearing, included an I-485 Permanent Residency (Green Card) Application (Court Exbts. 3-4) (with two pages missing), the I-864 Affidavit of Support (Court Exbt. 6) and a G-325A, Biographic Information Form (Court Exbt. 2).

After college Father worked periodically for his Father's export business, Rizkcozann Corp., of which he later became CEO and which he claims to have expanded following his Father's death. (Exbt. P-2) Father moved from New York to the Harrisburg area in the 1990's to live with his second wife whom he later divorced in 2004. Id. He has for a number of years operated a grocery store in Steelton, Pa. specializing in international foods which he operates as a cash business. (N.T. 5/17/13 at 70, 71)

In Father's I-134 Affidavit of Support, which he admittedly completed and submitted to the USCIS in 2005, he swore under oath to his financial condition as a sponsor for Mother that he was employed in retail export with Rizkcozann, had an annual income of $128,000, owned $57,000 in savings, and owned personal assets of over $2.9 million and real estate of over $1.8 million. (Court Exbt. 7; N.T. 7/11/12 at 5, 8, 11; N.T. 5/17/13 at 66)

Despite these claims in the I-134 Affidavit of Support, Father nevertheless testified that his average monthly income was only about $1,500 between 2002 and 2011. (N.T. 5/17/13 at 66-67; N.T. 5/17/13 at 66-67, 76) He testified that his income fell considerably, to only $800 to $900 per month, in 2012. (N.T. 7/11/12 at 9) According to Father, his Steelton store was heavily damaged in the flooding caused by Hurricane Irene in September 2011. He testified that although he had insurance and obtained some government loan assistance, he nevertheless suffered a half-million dollar loss. (N.T. 7/11/12 at 7)

As of the first hearing in July 2012, Father was not working but claimed he would be when his store was renovated. (N.T. 7/11/12 at 8) The store re-opened October 3, 2012 and Father anticipated earning a mere $15,000 per year. (N.T. 12/11/12 at 8) At the third hearing, he testified, rather unbelievably, that his gross weekly sales at his grocery store never exceed $880. (N.T. 5/17/13 at 72) Father eventually conceded that the maximum earning capacity he should be assigned as manager of an ethnic food store like the one he owns is $30,000. (N.T. 5/17/13 at 75, 77) He agreed that he was making less than his earning capacity and indicated that he had been looking for jobs in the food management business and had listed his grocery store for sale. (N.T. 5/17/13 at 75) Father also testified that generally his earning capacity maxes out at $39,000, which was the highest salary he claimed to have ever made, in 2004. (N.T. 5/17/13 at 66-67) This testimony was in direct contradiction to the information provided on the I-134

6

Affidavit of Support, Father admittedly signed April 13, 2005, in which he swore that his annual income (in 2004 or 2005) was $128,000. (Court Exbt. 7)

As of the date of the final hearing, Father was living rent free with his former (second) wife and their two teenaged daughters in Middletown, Pa. (N.T. 5/17/13 at 83) Father stressed that he provides financial support for these children. (N.T. 5/17/13 at 84-85) He testified that his former wife's earning capacity is $34,000. (N.T. 5/17/13 at 67) Father also claimed to have been paying all expenses for the house in which Mother was living and that he was allowing her to live there rent free. (N.T. 12/11/12 at 8; N.T. 5/17/13 at 67, 78)

Mother is currently 44 years old. Prior to her arrival in the U.S., she was a teacher in Egypt for fourteen years, primarily teaching Arabic, Islamic studies and the Koran at the middle school level. She has the equivalent of a four-year college degree and an Egyptian teaching certificate. She also started her Master's Degree in Egypt but has not completed it. (N.T. 5/17/13 at 7-9, 26) Since she has been in the U.S., she has not had a job other than helping out Father in his store for five months in 2008 and 2009. (N.T. 5/17/13 at 9)

As of the first hearing, Mother claimed she was unable to work because she did not have the proper paperwork, including a Green Card, but was in the process of obtaining a work visa which she did obtain in the summer of 2012. (N.T. 7/11/12 at 6; N.T. 5/17/13 at 7, 10) Thereafter, Mother unsuccessfully sought a job teaching Arabic at a private Islamic school. (N.T. 5/17/13 at 33-34) As of the final hearing, Mother was taking English classes and intended to complete her Master's Degree. (N.T. 5/17/13 at 11-12) She does not have a driver's license or access to a car. (N.T. 5/17/13 at 35)

As of the last hearing, she was living in a house owned by Father with their two children, currently aged seven and three. She testified that the home was without utility service since Father had ceased paying utility bills as well as monthly mortgage payments. (N.T. 7/11/12 at 21) Mother has received public benefits including SNAP (food stamps) and WIC. (N.T. 5/17/13 at 13) As of September 2013, she intended to enroll the younger child in half-day Head Start preschool. (N.T. 5/17/13 at 6)

7

Father claimed that after coming to the U.S., Mother continued to receive money from her family as well as a teacher's salary from the Egyptian government of $212 per week, noting that under Egyptian law, she cannot be fired. (N.T. 5/17/13 at 55-56) Father supplied original and translated copies of a document allegedly produced from the Egyptian education ministry reflecting her salary through June 2012. (Exbt. R-3; N.T. 7/11/12 at 9; N.T. 12/11/12 at 7) Mother denied receiving any money from her family in Egypt or an income from the Egyptian government. (N.T. 7/11/12 at 10; N.T. 5/17/13 at 14, 56)

## Legal Discussion

The primary questions concern (1) a determination of the parties' incomes and/or earning capacities, (2) whether this court must recognize the Egyptian divorce decree entered against Mother in *absentia,* and (3) whether Father has an independent obligation to support Mother under the I-864 Affidavit of Financial Support signed by Father but never submitted to the USCIS.

### *Income and Earning Capacity*

Father argues that his support obligation should be reduced to reflect his lowered income and that Mother should be assigned an earning capacity. Mother argues that Father should be held to his earning capacity which she asserted was much higher than his claimed income.

Parents have an absolute obligation to support their children and this obligation "must be discharged by the parents even if it causes them some hardship." Mencer v. Ruch, 928 A.2d 294, 297 (Pa. Super. 2007) (citations omitted). "[I]n Pennsylvania, a person's income must include his earning capacity, and a voluntary reduction in earned income will not be countenanced[.]" Id. "Where a party willfully fails to obtain appropriate employment, his or her income will be considered to be equal to his or her earning capacity[,]" not equal to his or her actual earnings. Ney v. Ney, 917 A.2d 863, 866 (Pa. Super. 2007) (citation omitted); Woskob v. Woskob, 843 A.2d 1247, 1251 (Pa. Super. 2004) (determining that "where there is a divergence" between a person's actual earnings and his or her earning capacity, "the obligation is determined more by earning capacity than actual earnings"). Importantly, "the needs of the child must be considered in making any employment decision[.]" Smedley v. Lowman, 2 A.3d 1226, 1228 (Pa. Super. 2010).

8

With regard to earning capacity, the Support Guidelines provide the following guidance:

**(d) Reduced or Fluctuating Income.**

\*     \*     \*

(4) *Earning Capacity*. If the trier of fact determines that a party to a support action has willfully failed to obtain or maintain appropriate employment, the trier of fact may impute to that party an income equal to the party's earning capacity. Age, education, training, health, work experience, earnings history and child care responsibilities are factors which shall be considered in determining earning capacity. In order for an earning capacity to be assessed, the trier of fact must state the reasons for the assessment in writing or on the record. Generally, the trier of fact should not impute an earning capacity that is greater than the amount the party would earn from one full-time position. Determination of what constitutes a reasonable work regimen depends upon all relevant circumstances including the choice of jobs available within a particular occupation, working hours, working conditions and whether a party has exerted substantial good faith efforts to find employment.

Pa.R.C.P. 1910.16–2(d) (4).

I find that based upon the evidence, Father has willfully failed to obtain appropriate employment commensurate with his earning capacity. I further find that based upon an evaluation of his age, education, training, health, work experience, earnings history and child care responsibilities, that his realistic earning capacity is at least $50,000 per year.

Father has a long history in business including working with his Father's export business, and then later managing and owning his own wholesale and later retail food company. He has the equivalent of a Bachelor's degree plus certificates reflecting continuing education in his field. The record reflects that as of the mid 2000's, Father and Rizkcozann were very successful and that Father was then earning $128,000 per year and holding assets worth over $3.7 million, as he swore to in his I-134 Affidavit of Support. (Court Exbt. 7) Though his retail store suffered a flood loss in 2011, it reopened in October 2012. Father in fact admitted that his claimed earnings from his cash business, as of 2012, of only $800 to $900 per month, did not reflect his own assessment of his earning capacity, which he set as between $30,000 and $39,000. (N.T. 5/17/13 at 66-67, 75, 77) Given his education, earnings history and an extensive and largely successful business background, in particular, Father is certainly capable of earning at least $50,000 per year.

9

With regard to Mother, I find that based upon her age, education, training, health, work experience, earnings history and child care responsibilities, that as of September 2013, when Mother's youngest child began pre-school, she is realistically able to earn a minimum wage income ($7.25 per hour) full-time (forty-hour week). It is unrealistic to believe she could obtain a higher paying teaching job, given her lack of Pennsylvania teacher certification and her limited area of teaching expertise (Arabic and Islamic studies). (N.T. 5/17/13 at 32) Mother's job choices are further limited by her less than proficient English skills and her lack of a driver's license or access to a car. As such, her employment prospects will be limited due to her need to use public transportation. (N.T. 5/17/13 at 35) In addition, she is still the primary caretaker of the parties' two young children. I further find that prior to her youngest child's attendance at pre-school in September 2013, she should not be assigned an earning capacity due to a lack of access to affordable child care in combination with the job market limitations listed above.

Finally, Father claims that the Court should include in Mother's income a $212 per week teacher salary she was allegedly receiving from the Egyptian government, as evidenced by the paperwork Father submitted to the court. (Exbt. R-3) Mother denied she received any such salary. Even if this court were to assume the Egyptian documents and translation are accurate and that Mother had been receiving money from the Egyptian government, there was no evidence offered that she was still receiving this income after June 2012, and as such, this court will not include this alleged salary as income to Mother.

*Enforceability of Egyptian Divorce Decree*

Father asserts that he owes Mother no spousal support since the parties were divorced under an Egyptian divorce decree issued January 19, 2006. He supplied a copy of the decree, as well as an English translation of the decree, in support. (Court Exbt. 5) Mother vehemently denied she and Father had been divorced, alleging that the decree was a fraud. In addition, Mother testified she had been provided with no notice of the Egyptian proceeding, rendering it a nullity.

At the outset, this court agrees with Mother that the divorce decree issued in Egypt appears inauthentic and is possibly a fraud. Primarily, the decree recites that both parties attended the divorce proceeding in person on January 19, 2006 and that each made a statement at the proceeding of their intent to divorce. (Court Exbt. 5, pp. 4-5). There was no evidence provided supporting either

10

party's attendance at the Egyptian divorce proceeding. Mother credibly denied being in Egypt on that date, noting that she gave birth to the parties' first child in the U.S. just four days later. Father provided no evidence that he was in Egypt when the decree was issued, which he could have easily established by supplying his passport. This Court additionally notes that the parties continued to live together as a married couple for more than six years following the alleged divorce, including conceiving a second child in 2009, reflecting that Father never considered himself divorced from Mother.

Father clarified at the final hearing that he was not in Egypt when the decree was issued but claimed that divorce is permissible in Egypt in *absentia* and that the divorce is therefore valid. Assuming, for the sake of argument that the decree was validly issued under Egyptian law,[4] it is not enforceable in Pennsylvania for a number of reasons. A judgment issued in a foreign country may be enforceable in Pennsylvania under the principle of comity, described as follows:

> "Although we must give full faith and credit under the mandate of the United States Constitution to a decree of adoption by a court of a sister state if such court had jurisdiction over the parties and the subject matter, judicial decrees rendered in foreign countries depend for recognition in Pennsylvania upon comity ..." In re Christoff's Estate, 192 A.2d 737, 738 (Pa. 1963). ...

> "Comity is a recognition which one nation extends within its own territory to the legislative, executive, or judicial acts of another. It is not a rule of law, but one of practice, convenience, and expediency. Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws. Comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3rd Cir. 1971), *cert. den.,* 405 U.S. 1017 (1972).

Hilkmann v. Hilkmann, 816 A.2d 242, 245 (Pa. Super. 2003) aff'd, 858 A.2d 58 (Pa. 2004). A foreign divorce may be attacked collaterally by the opposing spouse where his or her rights are involved; the right to impeach collaterally a decree of divorce made in a foreign jurisdiction by

---

[4] Under Egyptian law, as codified within the Hague Convention on divorce and separation, of which Egypt is a signatory, Egyptian nationals can divorce without any requirement of domicile (habitual residency). *The Hague Convention on the Recognition of Divorces and Legal Separations of June 1, 1970,* Art. 2(3) (www.hcch.net). Thus, the Egyptian divorce decree in this case, issued in *absentia,* might have been validly processed under Egyptian law.

11

showing fraud or want of jurisdiction has been frequently recognized. Sargent v. Sargent, 307 A.2d 353, 355 (Pa. Super. 1973).

In order for an extra-national divorce decree to be enforceable here, at least one party must have established a domicile in the issuing country and the defendant must have been personally served with process or appeared in the foreign proceeding. Com. v. Custer, 21 A.2d 524, 528 (Pa. Super. 1941) (divorce decree issued by sister state will not be recognized without personal service on the respondent except in cases where the state granting the divorce is the matrimonial domicile or where the respondent appears and defends the action); Perrin v. Perrin, 408 F.2d 107, 109 (3d Cir. 1969) (a divorce decree may be collaterally attacked for lack of domiciliary jurisdiction or if the defendant was not personally served and did not appear). See also, Sargent, supra and Drakulich v. Drakulich, 482 A.2d 563, 565 (Pa. Super. 1984) (citing In re Christoff's Estate, supra) (the Commonwealth will decline to grant recognition to the decrees of foreign tribunals where "the process of the foreign tribunal was invoked to achieve a result contrary to our laws or public policy or to circumvent our laws or public policy").

With regard to domicile, our courts have recognized the "established and familiar principle" enunciated by the U.S. Supreme Court, "that judicial power to grant a divorce is founded on domicile" and that "in the absence of domicile by at least one of the parties to the action, the Court has no jurisdiction over the cause and its decree will consequently, not be endowed with extraterritorial effect." Com. v. Doughty, 144 A.2d 521, 525-26 (Pa. Super. 1958) (citing Williams v. North Carolina, 325 U.S. 226, 240 (1945)). "An absolute prerequisite to judicial recognition of an out-of-state divorce is that the plaintiff must have resided in the state or country for a minimum period of residency as determined by local authority and that the residency be accompanied by "domiciliary intent", i.e., an intent to remain in the foreign jurisdiction." Sargent at 356 (citations omitted). Such a requirement is jurisdictional and cannot be waived by the acts of the parties. Id. (citation omitted). Both physical presence in the jurisdiction and a then-present intent to permanently reside there are essential characteristics of domicile. Kyle v. Kyle, 6 Pa. D. & C.3d 279, 282 (Pa. Com. Pl. 1978) (citing Stottlemyer v. Stottlemyer, 329 A. 2d 892, 899 (Pa. 1974) and McCloskey v. McCloskey, 366 A. 2d 279, 280 (Pa. 1975)).

12

Accordingly, for the Egyptian divorce decree to be valid here, Father, as the plaintiff in the divorce action, must prove that he resided in Egypt for a minimum period of residency as determined by Egyptian law and that his residency was accompanied by domiciliary intent. Sargent, supra. He has proven neither. Under Egyptian law, as codified within the Hague Convention on divorce and separation, jurisdiction is established for an Egyptian national seeking divorce in Egypt where Egypt is his "habitual residence" at the time of the proceeding. *The Hague Convention on the Recognition of Divorces and Legal Separations,* Art. 2(4). The term "habitual residence" is interchangeable with "domicile" under the Hague Convention. Id. at Art. 3. Except in circumstances not at issue here, there is no minimal time limitation necessary to establish habitual residence under the Hague Convention / Egyptian law. Nevertheless, Father provided no evidence of a habitual residence there at the time he initiated divorce proceedings. Instead, the record before the court was that Father visited Egypt for a few months in early 2005 in order to marry Mother and initiate Visa proceedings to allow her to travel to the U.S. and join him here. Father has clearly remained a full time domiciliary in the United States since his arrival here in approximately 1987, and of Pennsylvania in particular, since sometime in the 1990's.

Father also failed to produce any evidence of an intent to make Egypt his domicile on or around May 2005 when he allegedly initiated the divorce action. Because Father lacked habitual residence (domicile) within Egypt, or an intent to make it his domicile, the Egyptian decree cannot be recognized in Pennsylvania. See, Sargent at 356 (Mexican divorce decree unenforceable in Pennsylvania where husband went to Mexico for the express purpose of obtaining a divorce without intent to remain beyond the period necessary to come under the jurisdiction of the Mexican courts); Doughty at 526 (Mexican divorce held devoid of extraterritorial effect where no domicile established by defendant) and Taylor v. Taylor, 8 Pa. D. & C.4th 277, 283 (Com. Pl. 1990), aff'd, 599 A.2d 709 (Pa. Super. 1991) (Haitian divorce decree invalid in Pennsylvania absent domiciliary intent on the part of plaintiff and the absence of any notice to or joinder by defendant in the Haitian proceeding); see also Basiouny v. Basiouny, 445 So. 2d 916, 918-19 (Ala. App. 1984) (Alabama court refused to recognize Egyptian divorce decree between Egyptian natives who has been married there in 1969, but who later became naturalized U.S. citizens and permanently resided in Alabama for more than ten years, where

13

husband obtained the divorce after residing in Egypt for only two weeks; husband had clearly not established domicile in Egypt).

The Egyptian divorce decree must also be rejected from recognition in Pennsylvania because there is no evidence that Mother was ever served with notice of the Egyptian proceeding and thus lacked an opportunity to defend that action. Custer and Perrin, supra. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). Mother's lack of notice of the Egyptian proceeding is fatal to Father's attempt to enforce the Egyptian divorce decree here (absent her appearance in Egypt at that proceeding). For this reason, and the others cited above, it is clear under Pennsylvania law that comity cannot be extended to this extra-national divorce decree.

Accordingly, for the reasons set forth above, the parties remain married and Father is responsible to provide spousal support to the extent required under Pennsylvania law.

### *Affidavit of Support (I-864) – Legal Effect*

Father challenges my finding, following the second hearing, that he owes Mother an independent duty of spousal and child support pursuant to the I-864 Affidavit of Support he filled out and signed before a notary. I agree. As noted, Mother provided the court with a copy of that document (which she obtained from his files) upon which I based the December 11, 2012 order of support. As noted, I later vacated that order. The evidence presented confirms that while Father filled out the I-864 Affidavit of Support, signed it and had it notarized, Father never submitted it to the USCIS because he and Mother never (re)married and pursued a Green Card application with the USCIS. [5] As such, Father never became obligated to support Mother under its terms. Accordingly,

---

[5] Father stated at the second hearing that the I-864 Affidavit of Support submitted by Mother had been stolen by her from his office along with a number of other papers. (N.T. 12/11/12 at 15) At the third hearing, however, he asserted the I-864 was a complete forgery that Mother had filled it in her handwriting. He also denied signing it, though he conceded that the signature on the form looked like his. (N.T. 5/17/13 at 91-92). Based upon the testimony and a review of the documents submitted to the court, it is clear beyond any peradventure that the writing on the I-864 (Court Exbt. 6), as well as the other documents related to the request for a Green Card (Court Exbts. 2 (G-325A, Biographic Info.) and 3-4 (I-

14

Father's duty to provide spousal support will be determined in this case solely under the Pennsylvania Support Guidelines. [6]

### Support Calculation

There are three support periods applicable here: (1) child support only from September 7, 2012, the date Father filed for modification of the support award, through January 10, 2013; (2) child and spousal support from January 11, 2013, the date Mother requested spousal support / alimony pendente lite, through August 31, 2013; and (3) child and spousal support from September 1, 2013, the date Mother is attributed an earning capacity, to date.

For the purpose of calculating support, and based upon his assigned earning capacity of $50,000, Father's monthly net income (filing as a single taxpayer) is $3,181 for all relevant time periods. Mother's earning capacity is assigned as zero for the period between September 7, 2012 and August 31, 2013. Effective September 1, 2013, her monthly net income, based upon a full time minimum wage job (filing taxes as a head of household with two children), is $1,111.

Applying these incomes to the first time period, Father owes Mother child support of $909 per month under the Support Guidelines. For the second time period, Father's monthly support

---

485, Permanent Residency (Green Card) Application), which Father suggests are forgeries, are all filled in in Father's handwriting. The handwriting on these documents is identical in every respect to the I-134 Affidavit of Support Father admittedly submitted as part of the K1 fiancée filings. (N.T. 12/11/12 at 15-16; N.T. 5/17/13 at 65-66; Court Exbt. 7 (I-134 Affidavit of Support)) The record further established that Mother, at the time (in 2005 and 2006), did not speak or write in English. Her signature does appear on a few of the documents; however, her signature is noticeably distinct from the other handwriting (printing) on the forms, which is clearly Father's. Mother credibly testified that she simply signed documents Father presented to her. (N.T. 5/17/13 at 17-18)

In light of this evidence, this Court finds that Father's claim to this Court that the un-submitted I-864 Affidavit of Support was not filled in by him in his handwriting or signed by him with his signature to be utterly false.

[6] Had the I-864 Affidavit of Support been submitted as part of Mother's application to obtain permanent residency, Father, as the sponsor, would have been contractually obligated to provide economic support to Mother, the sponsored immigrant, at 125% of the federal poverty level applicable to the size of Mother's household until any of the following occurred: Mother could be credited with 40 quarters of work, the death of Father or Mother, or upon Mother leaving the U.S. See Court Exbt. 6. The contractual obligation arising under an I-864 Affidavit of Support is enforceable in any court by the sponsoree, the federal government, any state government and any governmental agency that provides the sponsoree a means-tested public benefit. Love v. Love, 33 A.3d 1268, 1273 (Pa. Super. 2011) (citation omitted). In the case where the sponsor and sponsoree are married, this obligation is independent of spousal support and survives divorce. Id. In the context of a spousal support proceeding, the Affidavit of Support may be considered a basis for deviation from the presumed baseline amount awarded under the guidelines. Id. at 1275.

obligation is $909 for the children and $386 for spouse. For the third time period, Father's monthly support obligation is $856 for the children and $89 for spouse.[7] Father is entitled to a $1,907.84 credit against his arrears for payments he proved he made on the home in which Mother and the children have lived. (N.T. 5/17/13 at 87-88, 97-98)

Accordingly, I enter the following:

## ORDER

AND NOW, this __8th__ day of October 2013, it is directed as follows:

(1) effective September 7, 2012 through January 10, 2013, Father's monthly support obligation for two children is $909;

(2) effective January 11, 2013 through August 31, 2013, Father's monthly support obligation is $909 for the children and $386 for spouse; and

(3) effective September 1, 2013 to date, Father's monthly support obligation is $856 for the children and $89 for spouse.

Arrears stand payable at $190 per month. Father is entitled to $1,907.84 credit against his arrears.

BY THE COURT:

Jeannine Turgeon, Judge

Distribution:
Mohammed Rizk – P.O.B. 220, Highspire, PA 17034
Rachel Haynes Pinsker, Esq. - YWCA Legal Ctr., 112 Market St Flr. 2, Harrisburg, PA 17101
Kim Robison – Direction-Dauphin County Domestic Relations

---

[7] All support figures were calculated by the Dauphin County Domestic Relations Section using the income figures noted above and applying the formulae set forth in the Support Guidelines. See Pa.R.C.P. 1910.16-4. All three support calculations include a reduction to Father's support obligation due to his financial obligation to the two minor children he has with his second wife, pursuant to Pa.R.C.P. 1910.16-7(b). For purposes of making that multiple family deviation, the Domestic Relations Section calculated Father's support to his second family using an assigned earning capacity to the former wife of $34,000.

16